J-S02016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: K.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1799 EDA 2021 |

Appeal from the Decree Entered August 12, 2021
In the Court of Common Pleas of Chester County Orphans' Court at
No(s): AD-200-0042

| IN THE INTEREST OF: A.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1800 EDA 2021 |

Appeal from the Decree Entered August 12, 2021
In the Court of Common Pleas of Chester County Orphans' Court at
No(s): AD-200-0043

| IN THE INTEREST OF: T.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1801 EDA 2021 |

Appeal from the Decree Entered August 12, 2021
In the Court of Common Pleas of Chester County Orphans' Court at
No(s): AD-200-0046

BEFORE:  OLSON, J., KING, J., and McCAFFERY, J.

J-S02016-22

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 31, 2022**

Appellant, T.S. (Father), appeals from the decrees entered on August 12, 2021 involuntarily terminating Father's parental rights to his three children, A.M.S. (a female born September 2010), K.M.S. (a female born March 2015), and T.M.S. (a male born February 2018) pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1] We affirm.

We briefly summarize the facts and procedural history of this case as follows. The Chester County Department of Children, Youth, and Families (CYF) received a report from Children's Hospital of Philadelphia that K.M.S., who was diagnosed with leukemia, was not receiving needed chemotherapy treatment and proper medical care. CYF also received reports of Mother's and Father's use of controlled substances, including methamphetamines. On numerous occasions, police responded to calls of domestic violence at a residence shared by Mother and Father.[2] In September 2018, the family was evicted from their home. Mother and the children eventually moved in with Mother's paramour. Following an investigation, in February 2019, CYF indicated that the medical neglect by Mother and Father constituted child abuse. In March 2019, Father was incarcerated and charged with harassment,

_____

[1] On September 29, 2021, by *per curiam* order, this Court *sua sponte* consolidated the children's cases. The trial court also involuntarily terminated the parental rights of the children's biological mother, C.M. She has also appealed, but her appeals are docketed separately from the instant matter.

[2] Mother and Father were in a relationship for nine to 10 years, but never married.

- 2 -

kidnapping, unlawful restraint of a child, and concealment of the whereabouts of a child when Father allegedly went to the residence where Mother and the children were living, threatened Mother by knife while holding T.M.S., pushed K.M.S. to the ground, and fled with T.M.S. While Father was incarcerated, CYF learned that K.M.S. was not receiving necessary medical care. Father was released on bail with the condition that he was to have no contact with T.M.S. and K.M.S. Trial is still pending in Father's criminal matter. In May 2019, Father was charged with destruction of property for allegedly destroying a trailer he shared with Mother at the time. He was incarcerated from July 2019 to January 2020.

On March 28, 2019, CYF assumed care of the children. On April 15, 2019, the children were adjudicated dependent. The trial court entered various dependency orders setting goals for Father's reunification with the children. Father was to complete drug and alcohol and mental health evaluations and follow treatment recommendations. Father was also ordered, once released from prison, to submit to random urine screenings and a hair follicle test for narcotics, establish stable housing and employment, participate in the children's medical care, resolve his criminal matters, and maintain contact with CYF.

On August 7, 2020, CYF filed petitions for the involuntary termination of the parental rights of both Mother and Father pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Father was incarcerated again

in December 2020.[3]  The trial court held hearings on April 7, 2021 and May 28, 2021 wherein Father was present.  On August 12, 2021, the trial court entered decrees involuntarily terminating Mother's and Father's parental rights to A.M.S., K.M.S., and T.M.S.  This timely appeal resulted.[4]

On appeal, Father presents the following issue for our review:

Whether the Orphans' Court abused its discretion and/or erred as a matter of law in terminating [F]ather's parental rights pursuant to [Sections] 2511(a)(5) [and] (a)(8) and 2511(b) of the Adoption Act[?]

Father's Brief at 5.[5]

First, Father argues the trial court erred or abused its discretion in terminating his rights pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (a)(8).  **Id.** at 12-15.  More specifically, Father contends the trial court erred by "assuming the possibility of [Father's] lengthy incarceration[,]" despite acknowledging Father was entitled to the presumption of innocence on his pending criminal charges.  **Id.** at 12.  He further claims the trial court abused its discretion by terminating his parental rights when "the children were

---

[3]  Father was still incarcerated at the time the trial court issued its opinion in this matter.

[4]  On September 9, 2021, Father filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2).  On September 28, 2021, the trial court filed an opinion with this Court pursuant to Pa.R.A.P. 1925(a).

[5]  Although Father presents a single issue in his statement of questions presented on appeal, he divides his argument into 3 sections.  We will address the first two arguments pertaining to Section 2511(a) first and then examine Father's Section 2511(b) argument separately.

indicated for medical neglect while in Mother's custody[.]" *Id.* Moreover, Father claims he complied with the court ordered goals for reunification. *Id.* at 13. Father maintains he submitted to drug screening in January 2020 while he was incarcerated, completed drug, alcohol and mental health treatment at Eagleville Hospital upon release from prison, and submitted a hair follicle test in March 2020. *Id.* Regarding contact with the children, Father avers:

> Father did utilize resources available while in prison, but his efforts were to no avail because of the bail condition in his criminal case that he have no contact with two of his children, T.M.S. and K.M.S.
>
> Father was granted supervised visitation in the April 15, 2019, and June 24, 2019 dependency orders, but after [CYF's] objection to supervised visits, [the trial] court adopted [CYF's] recommendation that the no contact order be expanded to include all three children until the bail conditions were modified.
>
> Father testified that he unsuccessfully attempted to have the bail conditions modified and the [trial] court refused to modify visits from July 5, 2019, until it permitted telephone contact with A.M.S. pursuant to its May 29, 2021 order over the objections of [CYF].
>
> Although Father's efforts to have contact with his children were unsuccessful, Father did utilize the resources available while incarcerated.

*Id.* at 14 (record citations and unnecessary capitalization omitted).

> We adhere to the following standards:
>
> In cases involving termination of parental rights: our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child.
>
> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the

record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result.

*In re Z.P.*, 994 A.2d 1108, 1115–1116 (Pa. Super. 2010) (internal citations, quotations, and original brackets omitted).

Here, the trial court involuntarily terminated Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a).

This Court has stated:

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated.

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

Additionally,

to be legally significant, the post-abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

There also is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is:

> To remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

In the case of an incarcerated parent, this Court has held:

> the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

> \* \* \*

> Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

> Thus, a parent's basic constitutional right to the custody and rearing of his ... child is converted, upon the failure to fulfill his ... parental duties, to the child's right to have proper parenting and fulfillment of his ... potential in a permanent, healthy, safe environment. A parent cannot protect his

parental rights by merely stating that he does not wish to have his rights terminated.

Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children.

**The cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child**.

*In re Z.P.*, 994 A.2d at 1118–1121 (internal citations, quotations, and original brackets omitted; emphasis added).

Here, in its opinion, the trial court specifically addressed Father's mental health, drug abuse, housing, and employment in relation to Father's court ordered goals for reunification. Trial Court Opinion, 9/28/2021, at 7-12. The trial court acknowledged that Father submitted a hair follicle test in March 2020 and completed a drug and alcohol program at Eagleville Hospital. *Id.* at 8. However, the trial court also noted that upon release from Eagleville Hospital, Father was "therapeutically discharged" from a halfway house and told "he needed a higher level of care." *Id.* at 8. Father eventually went to live with his mother but failed to successfully complete the program at the halfway house or obtain care elsewhere. *Id.* As such, the trial court determined that Father only complied with his treatment reunification "goals when he [was] in a highly structured environment – prison or an inpatient facility" when his "compliance is monitored." *Id.* at 9. Moreover, the trial court noted that while Father claims that he will live with his mother upon his release from prison, she has a PFA against him and they have what Father

describes as a "love-hate relationship." *Id.* at 9. As such, the trial court found Father had not established "a stable environment for the children when Father is released from prison." *Id.* at 9-10. The trial court also determined that "[t]here was no evidence that Father can obtain employment when he is released" from prison. Father has not challenged these determinations.

Regarding Father's incarceration, the trial court acknowledged that imprisonment itself does not provide grounds for the involuntary termination of parental rights. *Id.* at 10. However, it also determined that "Father has been incarcerated during most of the two years that the children have been in the care of CYF." *Id.* at 6. The trial court also highlighted the fact that "Father acknowledged the domestic violence" with Mother. *Id.* at 11. As the trial court recounted, "Father destroyed the trailer where he and Mother had lived [and h]e was charged with destroying property." *Id.* Additionally, "[Father] faces kidnapping and other serious charges resulting from [the] incident on March 11, 2019" wherein he allegedly threatened Mother at knifepoint while holding T.M.S., pushed K.M.S. to the ground, and then absconded with T.M.S. *Id.* at 6. The trial court opined there is no certainty when Father will be released from prison. *Id.* at 10. Thus, the trial court was "not confident that [Father could] remain out of criminal custody" because he was engaged in a "pattern [of] incarceration, release, incarceration, release, and incarceration." *Id.* at 11. The trial court determined that all of the aforementioned conditions led to the removal and placement of the children, the children had been removed from the care of Father for a period of at least

six months, Father cannot or will not remedy those conditions, and that termination of Father's rights would best serve the needs and welfare of the children pursuant to Section 2511(a)(5).

Moreover, pursuant to Section 2511(a)(8), the trial court again relied upon the history of domestic violence between Mother and Father. *Id.* at 11. Regarding Father's contact with the children, the trial court noted that Father was unable to lift the provisions of his bail that prohibited contact with K.M.S. and T.M.S. and that there was no evidence that he contacted A.M.S. by telephone for supervised conversations even though he was permitted to do so. *Id.* at 11-12. The trial court determined that Father's actions led to the removal and placement of the children, the children had been removed from the care of Father for a period of at least 12 months, Father cannot or will not remedy the conditions, and that termination of Father's rights would best serve the needs and welfare of the children pursuant to Section 2511(a)(8).

Upon review, we agree with the trial court's assessments and discern no abuse of discretion or error of law in involuntarily terminating Father's parental rights pursuant to either Sections 2511(a)(5) or 2511(a)(8). Here, the trial court did not rely solely upon the possibility of a lengthy term of incarceration for Father as he suggests. Instead, the trial court recognized that the cause of Father's incarceration was relevant to its Section 2511(a) analysis. Here, Father's pretrial incarceration arose as a direct result of his own actions and, in part, resulted in the removal of the children. The trial court was not focused solely on the possibility of Father's future convictions or additional

incarceration. Rather, the trial court considered the impact of Father's incarceration while awaiting trial, as well as the no-contact conditions of his bail. Thus, the trial court did not err in considering Father's incarceration when terminating his parental rights. Father's own actions and incarceration resulted in the no contact provisions with two of his children and there is no evidence that Father contacted A.M.S. with whom contact was not forbidden. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life. Father has consistently failed to do so. Accordingly, we conclude that the trial court did not abuse its discretion or otherwise err in terminating Father's rights under Section 2511(a) of the Adoption Act.

Next, Father argues the trial court failed to "give sufficient weight and consideration to [F]ather's bond with the children" and, therefore, erred by terminating his parental rights involuntarily under 23 Pa.C.S.A. § 2511(b). Father's Brief at 15. He contends that "CYF presented no evidence about a bond, if any, between the children and Father." *Id.* Father posits that "[a] bonding assessment [] was not conducted despite the fact that in March 2020, when the parenting capacity and bonding assessment were conducted for Mother, Father was in a dual diagnosis drug and alcohol/mental health treatment facility and halfway house and readily accessible." *Id.* at 16. Father points to testimony from the doctor who performed the bonding assessment with Mother and the children, wherein the doctor stated that the children were "going to be affected if their bond with their parents [was]

- 13 -

severed" and that K.M.S. was heard yelling "I want my daddy" repeatedly. *Id.* at 15. Father argues the trial court abused its discretion by determining that "the passage of time weakened his bond" with his children and relying "primarily on the possibility of a lengthy incarceration" for Father. *Id.* at 16-17.

Pursuant to 23 Pa.C.S.A. § 2511(b), the trial court

shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Our Court has stated:

Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b).

When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

Above all else ... adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible

- 14 -

dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d at 1121 (internal citations, quotations and brackets omitted).

Moreover,

[i]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, and original brackets omitted).

Regarding 23 Pa.C.S.A. § 2511(b), the trial court determined:

At the May 28, 2021 hearing, Father testified that he has had no contact with the children since March of 2019. It is unlikely that T.M.S., who was born in February of 2018, has any bond with Father. The passage of time has weakened the bond between K.M.S. and Father, and A.M.S. and Father.

Father testified that he is depressed about having no contact with the children for over two years. He stated he feels angry and sad. [Father testified,] "I miss my children."

It is Father's conduct that resulted in the ongoing incarcerations, although he is presumed innocent of the current charges. If convicted of pending charges, he faces more years in prison. It has been two years since he parented the children and he has

- 15 -

been and remains unable to provide the stability and structure that the children need.

* * *

[The trial court found] that termination of Father's parental rights will best serve the needs and welfare of K.M.S., A.M.S., and T.M.S., and [] will have no long[-]term adverse effect on the children.

Trial Court Opinion, 9/28/2021, at 13-14.

We discern no abuse of discretion or error of law in terminating Father's parental rights under Section 2511(b). Initially, we note that Section 2511(b) does not require a formal bonding evaluation and the trial court was not required to rely upon expert testimony. Instead, the trial court was permitted to evaluate the testimony of the CYF caseworker involved in this case in rendering its decision. She testified that Father never participated in parenting assessments since CYF became involved. N.T., 4/7/2021, at 142. She also testified that CYF "wouldn't have been able to do any sort of bonding assessment that goes along with the parenting evaluation due to [Father's] no contact [order] with the children." **Id.** at 143. Finally, the caseworker testified that the children "always seem excited to see the foster parents" and that "the foster parents are very in tune with what these children need." **Id.** at 149-150. She opined that the children are bonded with their foster parents, permanent placement with, or adoption by, the foster parents was the best long-term option for the children, and that "the foster parents have done a wonderful job of ensuring that these children's needs are met." **Id.** at 150-151. Accordingly, the certified record shows the trial court properly

considered the intangibles, such as the love, comfort, security, and stability the children have with the foster parents, considered the importance of continuity of relationships, and determined the bond between Father and the children could be severed without long-term, detrimental effects on them. The trial court gave adequate consideration to the needs and welfare of the children under Section 2511(b). Father's own feelings cannot prevent termination of his parental rights. For all of the foregoing reasons, Father is not entitled to relief on appeal.

Decrees affirmed.

Judge McCaffery joins.

Judge King did not participate in the consideration or decision of this case.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/31/2022